**THE HONORABLE BARBARA J. ROTHSTEIN**

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| IN RE: PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION, | **MDL: 1407** <br> **DECLARATION OF JANE E. JOSEPH** |
| This document relates to: <br> Quezada v. McKesson Corporation <br> Case No. 2:02-cv-02599 | |

I, JANE E. JOSEPH, declare under the penalty of perjury under the laws of the United States and the state of Ohio that the following is true and correct to the best of my knowledge:

1. I am an attorney with the law firm of Lopez, Hodes, Restaino, Milman & Skikos, 13938A Cedar Rd., Suite 373, Cleveland, Ohio 44118 and am counsel for plaintiff Alicia Quezada. I have personal knowledge of the materials attached herein and am otherwise competent to testify.

2. Attached as Exhibit A are true and correct copies of correspondence between plaintiff's counsel, Jane E. Joseph, and defense counsel, Roshan Rajkumar and Patrick O'Neill.

3. Attached as Exhibit B is a true and correct copy of Final MDL Pretrial Order dated October 15, 2004.

4. Attached as Exhibit C is a true and correct copy of correspondence of Patrick O'Neill to Jane E. Joseph dated September 23, 2004.

5. Attached as Exhibit D is a true and correct copy of deposition transcript pages from the deposition of Kevin Lloyd in *Florence Law vs. Zee Medical, Inc., J.B. Laboratories, Inc., L.N.K. International Inc., and McKesson Corporation, MDL Case No. 02-CV-2615.*

Dated this 19th day of October, 2004

s/ Jane E. Joseph__________
Jane E. Joseph

# EXHIBIT
# A

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
A LAW CORPORATION

13938A CEDAR RD • #373 • CLEVELAND, OH 44118
TELEPHONE / 330.425.3957 FACSIMILE / 330.425.3958

JANE E JOSEPH
(216) 921-9314
jejoseph@ix.netcom.com
Admitted in Minnesota and Ohio

June 9, 2003

Roshan N. Rajkumar
BOWMAN AND BROOKE LLP
150 South Fifth Street
Suite 1300
Minneapolis, MN 55402-1498

***Re: In Re: Phenylpropanolamine (PPA) Products Liability Litigation***
***MDL No. 1407; Alicia Quezada v. McKesson Corporation***
***Case No. 01-CV-2431 (DWF/AJB)***

Dear Roshan:

This letter will confirm the telephone message I left for you last Friday. It is my understanding that your client has been named in at least three cases in the PPA MDL yet we have been unable to locate your client's responses to the MDL discovery requests. Please advise whether McKesson has served its responses and if McKesson has not yet answered the discovery requests, when you intend to do so.

Thank you for your assistance in this matter.

Sincerely,

Jane E Joseph/aos

Jane E. Joseph

JEJ/aos

Bowman and Brooke LLP
Bowman and Brooke LLP
ATTORNEYS AT LAW

MINNEAPOLIS • PHOENIX • DETROIT • SAN JOSE • LOS ANGELES • RICHMOND


NEAPOLIS
: 2600
South Fifth Street
eapolis, MN 55402-4244
339-8682 (Tel)
372-3200 (Fax)

ENIX
enix Plaza
: 1700
North Central Ave.
enix, AZ 85012-2761
248-0899 (Tel)
248-0947 (Fax)

ROIT
: 600
West Big Beaver Road
MI 48084-5293
371-3000 (Tel)
371-3006 (Fax)

JOSE
: 200
Technology Drive
Jose, CA 95110-1355
279-5393 (Tel)
279-5845 (Fax)

ANGELES
: 1000
1 South Vermont Ave.
ance, CA 90502-1002
768-3068 (Tel)
719-1019 (Fax)

IMOND
front Plaza West Tower
: 1500
East Byrd Street
mond, VA 23219-4080
349-8200 (Tel)
349-1762 (Fax)

COUNSEL

VEGAS
Offices of
W. Marsh
387-0052

NEAPOLIS
neth Ross
ney At Law
333-1195

& Ward, L.L.C.
372-1100

ROIT
McGlynn, P.C.
349-6090

.bowman-brooke.com



Roshan N. Rajkumar
Direct Dial: (612) 672-3216
E-Mail: rrajkuma@bowman-brooke.com


June 13, 2003

**VIA FACSIMILE (216) 921-9334 & U.S. MAIL**

Jane E. Joseph, Esq.
Lopez, Hodes, Restaino
13938A Cedar Road
Suite 373
Cleveland, OH 44118

Re: Alicia Quezada v. McKesson Corporation
Case No.: 01-CV-2431 DWF/AJB

Dear Attorney Joseph:

In response to your inquiry as to McKesson Corporation's involvement in the PPA MDL and discovery, our client has informed us that it has filed responses to the MDL Discovery requests. They are working to get copies of those materials to us. If you are unable to locate these filed responses with the MDL in Seattle, WA, please let me know and I will forward copies once they are received.

Sincerely,

BOWMAN AND BROOKE LLP

Roshan N. Rajkumar

RNR/rnr

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS

A LAW CORPORATION

13938A CEDAR RD • #373 • CLEVELAND, OH 44118
TELEPHONE / 330.425.3957 FACSIMILE / 330.425.3958

JANE E JOSEPH
(216) 921-9314
jejoseph@ix.netcom.com
Admitted in Minnesota and Ohio

June 17, 2003

***Sent via facsimile transmission***

Roshan Rajkumar
BOWMAN AND BROOKE LLP
150 South Fifth Street
Suite 1300
Minneapolis, MN 55402-1498

***Re: In Re: Phenylpropanolamine (PPA) Products Liability Litigation***
***MDL No. 1407; Alicia Quezada v. McKesson Corporation***
***Case No. 01-CV-2431 (DWF/AJB)***

Dear Mr. Rajkumar:

Thank you for your letter of June 13 regarding McKesson Corporation's responses to the MDL discovery requests. I already made several attempts to obtain those documents from plaintiffs' liaison counsel but they are unable to locate them. I would appreciate it if you would forward a copy of those materials to me.

Thank you for your cooperation in this matter.

Sincerely,

Jane E Joseph/aos

Jane E. Joseph

JEJ/aos

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
A LAW CORPORATION

13938A CEDAR RD • #373 • CLEVELAND, OH 44118
TELEPHONE / 330.425.3957 FACSIMILE / 330.425.3958

JANE E JOSEPH
(216) 921-9314
jejoseph@ix.netcom.com
Admitted in Minnesota and Ohio

August 28, 2003

***Sent via facsimile transmission***

Roshan Rajkumar
BOWMAN AND BROOKE LLP
150 South Fifth Street
Suite 1300
Minneapolis, MN 55402-1498

***Re: In Re: Phenylpropanolamine (PPA) Products Liability Litigation***
***MDL No. 1407; Alicia Quezada v. McKesson Corporation***
***Case No. 01-CV-2431 (DWF/AJB)***

Dear Mr.Rajkumar:

I am writing to follow-up on my letter of June 17, 2003 requesting that your client answer the generic MDL discovery requests. You indicated your client did in fact answer plaintiffs' discovery requests and I would request that you immediately serve those pleadings on plaintiff Alicia Quezada.

Thank you for your cooperation.

Sincerely,

Jane E Joseph/aos

Jane E. Joseph

JEJ/aos

**Bowman and Brooke LLP**
ATTORNEYS AT LAW
MINNEAPOLIS • PHOENIX • DETROIT • SAN JOSE • LOS ANGELES • RICHMOND

NNEAPOLIS
ite 2600
0 South Fifth Street
nneapolis, MN 55402-4244
2/339-8682 (Tel)
2/672-3200 (Fax)

IOENIX
oenix Plaza
ite 1700
29 North Central Ave.
oenix, AZ 85012-2761
2/248-0899 (Tel)
2/248-0947 (Fax)

ETROIT
ite 600
West Big Beaver Road
oy, MI 48084-5283
3/871-3000 (Tel)
3/871-3006 (Fax)

AN JOSE
ite 200
41 Technology Drive
n Jose, CA 95110-1355
8/279-5393 (Tel)
8/279-5845 (Fax)

OS ANGELES
ite 700
9 West 190th Street
ardena, CA 90247-7468
0/768-3068 (Tel)
0/719-1019 (Fax)

CHMOND
verfront Plaza West Tower
ite 1500
1 East Byrd Street
chmond, VA 23219-4060
4/649-8200 (Tel)
4/649-1762 (Fax)

F COUNSEL

AS VEGAS
w Offices of
eg W. Marsh
2/387-0052

NNEAPOLIS
nneth Ross
torney At Law
2/933-1195

ard & Ward, L.L.C.
2/672-1100

ETROIT
as McGlynn, P.C.
8/649-6090

w.bowmanandbrooke.com

Roshan N. Rajkumar
Direct Dial: (612) 672-3216
E-Mail: Roshan.N.Rajkumar@MSP.BowmanAndBrooke.com

September 3, 2003

**VIA FACSIMILE (330) 425-3958.**

Jane E. Joseph, Esq.
Lopez, Hodes, Restaino, Milman & Skikos
13938A Cedar Road, #373
Cleveland, Ohio 44118

**Re:** ***In Re: Phenylpropanolamine (PPA) Products Liability Litigation MLD No. 1407; Alicia Quezada v. McKesson Corporation Case No. 01-CV-2431 (DWF/AJB)***

Dear Attorney Joseph:

In response to your correspondence dated August 28, 2003, I have spoken with my client and they are in the process of locating copies of discovery responses submitted in the MDL for Seattle, Washington. My client indicated that McKesson has filed discovery responses in more than one MDL in the U.S., and may have sent similar response to each MDL. I have requested that copies of whatever was filed with the MDL, Seattle, WA, be sent to this office as soon as possible, and I will forward the same onto you. Thank you for your patience in this matter. If you have any further questions, please do not hesitate to contact me. I anticipate having hardcopies of McKesson's responses filed with the MDL in seven business days.

Sincerely,

BOWMAN AND BROOKE LLP

Roshan N. Rajkumar

RR/mr

::ODMA\PCDOCS\MSP\260875\1

** TOTAL PAGE.02 **

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
A LAW CORPORATION
13938A CEDAR RD • #373 • CLEVELAND, OH 44118
TELEPHONE / 330.425.3957 FACSIMILE / 330.425.3958

JANE E JOSEPH
(216) 921-9314
jejoseph@ix.netcom.com
Admitted in Minnesota and Ohio

November 12, 2003

***Sent via facsimile transmission***

Patrick H. O'Neill, Jr.
O'Neill & Murphy, LLP
1050 Degree of Honor Building
325 Cedar Street
St. Paul, Minnesota 55101

***Re: In Re: Phenylpropanolamine (PPA) Products Liability Litigation***
***MDL No. 1407; Alicia Quezada v. McKesson Corporation***
***Case No. 01-CV-2431 (DWF/AJB)***

Dear Pat:

Thank you for speaking with me last week regarding your client's discovery obligations in the above-referenced matter. You asked that I relay what had transpired between the parties to date and I am happy to do that.

I wrote to Roshan Rajkumar at Bowman and Brooke on June 9, 2003 requesting McKesson's MDL discovery responses from the PPA MDL, an obligation he was to have met 60 days after the Quezada case was filed, or March 5, 2003. Mr. Rajkumar continued to promise those documents to me through September 3, 2003 when he indicated that the requested discovery responses would be provided within seven business days. I still have not received those documents. In fact, I did not learn that Mr. Rajkumar was no longer counsel of record until last week. Please forward your fully executed Notice of Substitution of Counsel and direct all future matters to me.

Please let me know when you will provide all documents and discovery responses your client has served in the PPA litigation.

Finally, I would appreciate your written confirmation of whom you represent and on what basis. Thank you for your assistance in this matter.

Sincerely,

Jane E. Joseph

JEJ/aos

O'NEILL & MURPHY, LLP
ATTORNEYS AT LAW

Timothy R. Murphy
Patrick H. O'Neill, Jr.
Stephen M. Warner

1050 Degree of Honor Building
325 Cedar Street
Saint Paul, MN 55101-1015
Tel: (651) 292-8100
Fax: (651) 292-8111

5482 County Road 18
Post Office Box 880
Nisswa, MN 56468
Tel: (218) 963-8100
Fax: (218) 963-8200

Legal Assistants

Kimberly A. Lewis
Shannon M. Bettis

Of Counsel
Peter J. Fetterly

Certified Trial Specialist, MSBA, NBTA
Also admitted in Wisconsin
Qualified ADR Neutral

Reply To: St. Paul Office

RECEIVED
DEC 1 2003
By

November 24, 2003

**Via Facsimile & U.S. Mail**
Jane E. Joseph, Esq.
Lopez, Hodes, Restaino,
Milman & Skikos
13938A Cedar Road, #373
Cleveland, OH 44118

RE: **Alicia Quezada v. McKesson Corporation**

Dear Ms. Joseph:

This will serve as written confirmation that we have been retained by Perrigo, who has accepted McKesson Corporation's tender of defense, relative to the above-entitled matter. I am attaching a fully executed Substitution of Counsel for your file.

It is my understanding from Perrigo's national counsel that Perrigo's documents have been produced to the MDL in Washington. As to McKesson's documents, McKesson is a distributor and not a manufacturer, and as such, is not required to produce documents as part of the MDL.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

O'NEILL & MURPHY, LLP

Patrick H. O'Neill, Jr.
poneill@o-mlaw.com

PHO:kal
Enclosure

cc: Gale D. Pearson, Esq. (W/Encl.)

# EXHIBIT
# B

THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE: PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION | MDL No. 1407 |
| This document relates to the actions listed on Attachment A | FINAL MDL PRETRIAL ORDER |

**FINAL MDL PRETRIAL ORDER**

This Final MDL Pretrial Order describes the events that have taken place in MDL 1407 and those items that require further action by the transferor court. A copy of this Final MDL Pretrial Order, along with the case file and materials, will be provided to the transferor court.

## I. INTRODUCTION

On August 28, 2001, the Judicial Panel for Multidistrict Litigation ("JPML") designated this Court as the transferee court for all individual, consumer class and other federal cases arising out of the sale or use of over-the-counter cough/cold and appetite suppressant products containing phenylpropanolamine ("PPA") for pre-trial consolidation and coordination. *In re: Phenylpropanolamine ("PPA") Products Liability Litigation*, MDL No. 1407.

The proceedings in this MDL 1407 began in earnest with the Order re: Initial Conference dated November 1, 2001, requiring plaintiffs and defendants to submit proposed

committee rosters, and scheduling the initial conference for November 16, 2001. Since then: (1) generic fact discovery has been completed or substantially completed as to most MDL defendants (including written discovery, document production and review, discovery depositions and requests for admissions); (2) a procedure for case-specific fact discovery in each case has been implemented, and discovery has been underway since 2002; (3) Rule 26 disclosures of generic experts have been made, the discovery depositions of those experts have been completed, and a process to permit the adoption of those experts' opinions in other cases transferred or being transferred to this MDL has been adopted; (4) trial preservation depositions of several of plaintiffs' and defendants' generic experts are underway or have been taken; (5) and the Court has resolved *Daubert* motions challenging plaintiffs' expert opinions solely as to general causation.

Given the foregoing, the Court is satisfied that this MDL has sufficiently matured and the Court has issued a Suggestion of Remand for the cases listed on Attachment A to facilitate their remand by the JPML to their transferor courts for further case-specific proceedings, including designation and discovery of case-specific experts, independent medical examinations, pre-trial motion practice and final disposition. Below is a more detailed overview of the proceedings in MDL 1407 to date.

## II. ADMINISTRATION OF CASES

### A. Lead and Liaison Counsel.

By order entered on November 20, 2001, this Court appointed and assigned certain responsibilities to Lead and Liaison Counsel for Plaintiffs and Defendants. (Order Appointing Lead and Liaison Counsel (signed Nov. 19, 2001, entered Nov. 20, 2001). The responsibilities of each are delineated in Memorandum in Support of Proposed Language Ordered by the Court in its November 1, 2001, "Order re: Initial Conference" (Nov. 14, 2001) (hereinafter, "Memo Nov. 14, 2001")).

**B. Committees.**

The Court approved and appointed members to various committees designed to manage and advance the litigation, including the Plaintiff's Steering Committee ("PSC"). (Order Appointing Members to Plaintiffs' and Joint Committees (Jan. 17, 2002) (hereafter "Order Jan. 17, 2002")). As part of its duties and responsibilities, the PSC assists all plaintiffs in MDL 1407 by overseeing discovery (including conducting extensive discovery of each defendant), by communicating with plaintiff lawyers, by appearing before this Court, by attending status conferences and by preparing motions and responses regarding case-wide discovery matters. The PSC acts on behalf of or in consultation with Plaintiffs' Lead Counsel in the management of the litigation. (Order Jan. 17, 2002; Plaintiffs' Lead Counsels' Status Report No. 1 (Nov. 30, 2001)); Memo Nov. 14, 2001).

**C. Common Benefit Fund.**

In order to provide for costs and attorneys' fees that the PSC (and its appointed subcommittees) may be entitled to receive for providing case-wide services over the last several years, the court provided for sequestration of four (4%) percent of all payments made by defendants in settlements or in satisfaction of judgments of cases transferred to MDL 1407, to be placed in escrow into the common benefit fund (a/k/a MDL 1407 Fee and Cost Trust Account). Similarly, in those state court cases where plaintiffs have agreed to coordinate with and use the MDL 1407 work product, the court provided for sequestration of three (3%) percent of all such payments. (The 4% and 3% payments are referred to collectively herein as "MDL Assessment"). The MDL Assessments are to be deposited by defendants into the common benefit fund and the total dollar amounts of these assessments are confidential. The common benefit fund will provide payment to PSC members and other common benefit attorneys for the PSC's work product to the extent that the court ultimately determines that the service was authorized, necessary and beneficial to plaintiffs. The MDL

Assessment requirement applies to all MDL 1407 payments made by defendants to plaintiffs, regardless of whether a plaintiff's case is disposed of while on the MDL 1407 docket or following remand to the transferor court.

The Common Benefit fund is governed by Amended CMO 8 (Establishing Plaintiffs' Litigation Expense Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for Common Benefit), CMO 16 (Establishing MDL 1407 Fee and Cost Trust Account and Procedures) and CMO 20 (Establishing Common Benefit Fee Committee, Procedures, and Standards to Determine Compensable Fees and Costs). CMO 16 effectuates CMO 8 and details the procedures for (1) assessing and depositing these funds into the account; (2) protecting the confidentiality of the information submitted to and from the Trustee; (3) insuring the accuracy of the information provided; (4) reporting by the Trustee to Liaison Counsel; and (5) resolving assessment disputes. (CMO 16). CMO 20 establishes the Common Benefit Fee Committee, and sets forth (1) procedures for the review of common benefit fee and cost applications and subsequent responsibilities, and (2) standards for the review of common benefit fees and costs. (CMO 20).

**D. <u>State/Federal Coordination</u>.**

It became evident in the beginning of MDL 1407 that the extensive parallel state and federal PPA litigation, involving many of the same defendants and the same plaintiffs' counsel in both state and federal courts, warranted particular emphasis on coordinated discovery. To this end, the parties in state and federal court have jointly succeeded in reducing costs and expenses to themselves and the court system by coordinating most generic discovery proceedings. For example, depositions of defendant representatives and employees were all cross-noticed and, with few exceptions, witnesses were deposed only once for purposes of all cases in the country. Such was also the case during expert discovery. Finally, the parties' presentation of expert testimony under *Daubert* (*see infra* Part III.C.)

was coordinated with many state court judges overseeing state court coordinated proceedings. Overall, serious efforts were made by the parties and this Court to achieve meaningful coordination, which were met with considerable success.

**E. Denial of Class Certification.**

The Court denied class certification in eight nationwide and one Louisiana statewide personal injury actions and in seven economic injury actions. (Order granting Defendants' Motion to Strike Class Allegations and Deny Class Certification (Jan. 5, 2002); Order Extending Court's June 5, 2002 Order Denying Class Certification to Additional Cases (Feb. 24, 2003); Order Denying Plaintiffs' Motion for Class Certification Pursuant to Rule 23(B)(3) for Economic Injury Claims (Sept. 4, 2003); (Order Denying Plaintiffs' Renewed Motion for Class Certification Pursuant to Rule 23(B)(3) for Economic Injury Claims (Feb. 7, 2003); Order Denying Certification of Kentucky Economic Injury Class (Nov. 5, 2003)).

## III. DISCOVERY

This MDL has proceeded in a relatively quick and stream-lined fashion, thanks in large measure to the cooperation of the parties. Shortly after commencing this case in the winter of 2001, the court began issuing Case Management Orders ("CMOs") to govern most case-wide issues, as well as case-specific orders. The Court entered 20 CMOs, as well as supplements to them. Some of the specific CMOs are discussed, *infra*, expanding on their specific subject matter. All CMOs are accessible at the Court's website, (www.wawd.uscourts.gov/ wawd/mdl.nsf/main/page.) The primary orders that governed the pretrial management of the discovery in this litigation are CMO Nos. 1, 2, 3, 6, 6A, 10 and 19.

- CMO 1: established a protocol for generic fact discovery (governing, *inter alia*, written discovery, document production and depositions of defendants' corporate representatives and employees);

- CMO 2: set forth a confidentiality order;
- CMO 3: provided a document preservation order; and
- CMO 6, 6A, 10 & 19: established a protocol for case-specific fact discovery (governing, *inter alia*, written discovery (including a Fact Sheet and Records Authorizations, document production and depositions of plaintiffs and case-specific fact witnesses).

A. **Generic Fact Discovery.**

1. **Document Discovery.** Extensive fact discovery was conducted against defendants and was substantially completed against most defendants by mid-2003. In an effort to attain consistency and to avoid undue duplication, the parties negotiated and agreed substantially upon master sets of requests for production and interrogatories ("Master Set of Written Discovery") which are attached to CMO 1. No further general document requests or interrogatories were allowed to be propounded on defendants without leave of Court. To the extent that any defendant had previously produced documents and/or made responses to document requests or interrogatories also contained in the Master Set of Written Discovery prior to January 21, 2002, those productions and/or responses were deemed responsive to the same requests contained in the Master Set of Written Discovery. (CMO 1 Parts V.E., V.F.).

Discovery was also conducted be the parties from Yale University and the various hospitals participating in the Hemorrhagic Stroke Project, from the trade association, the Consumer Healthcare Products Association, and from the U.S. Food and Drug Administration.

The PSC created a document depository located in Minneapolis, Minnesota, where millions of documents produced by defendants were stored, reviewed and digitized for use in discovery and for purposes of creating "trial packages" for all plaintiffs who were interested and who agreed to the set-aside percentage.

2. **Depositions of Common Fact Witnesses.** The basic principles governing the taking of depositions of defendants' non case-specific (generic) fact witnesses were set forth in CMO 1. Cross-notices between state court proceedings and the MDL proceedings were encouraged. (CMO 1 Part V.G.). In the interest of efficiency and federal-state coordination, several defendants cross-noticed the depositions of company witnesses, HSP Investigators and CHPA employees in their respective state court proceedings.

**B. Case-Specific Fact Discovery.**

The basic principles of governing the taking of fact discovery of plaintiffs were set forth in CMO 6 (case-specific fact discovery procedure and plan). Under CMO 6, later modified by CMO 10, cases docketed in the MDL by February 12, 2002, had case-specific discovery cut-off dates of February 28, 2003. Cases docketed after February 28, 2003, were to have case-specific discovery completed within 12 months of the docket date. (CMO 6 Part VI.). As discussed further below, however, due to numerous delays many of these case-specific discovery cut-off dates were extended.

1. **Case-Specific Fact Discovery of Plaintiffs.**

a. **Plaintiff Fact Sheets (PFSs).** Under CMO 6, plaintiffs in every case transferred to MDL 1407 were ordered to complete a plaintiff fact sheet (PFS). (CMO 6 Part II.A.). Plaintiffs were required to complete and serve on defendants' liaison counsel fact sheets. In the event of a plaintiff's failure to serve a completed PFS, defendants' liaison counsel was to send a warning letter to that plaintiff. If, within 30 days of a warning letter, the plaintiff had still failed to serve a completed PFS, defendants were able to seek appropriate relief from the Court if a meet and confer did not otherwise resolve the issue. (CMO 6 Part III.A.).

Under CMO 10, entered seven months after CMO 6, the Court ordered that no case would be considered for remand if any plaintiff had not completely complied with the

discovery requirements of its prior orders, including the completion of a PFS. (CMO 10 ¶ 1). Failure to provide complete PFS responses tolled the period for completion of fact discovery, which would not run until one year after defendants' receipt of a completed PFS and its accompanying authorizations. (CMO 10 ¶ 3).

Finally, CMO 19 provides for the issuance of a Show Cause Order why the Court should not dismiss a case for failure to prosecute, based on a plaintiff's failure to timely file a PFS or cure a PFS that is not complete in all respects within fifteen days of notice of deficiencies.

b. <u>Other Written Discovery</u>. In addition to the PFS, defendants were entitled to propound ten (10) interrogatories and ten (10) requests for production (non-duplicative of any issue raised via PFS) on each plaintiff during the case-specific fact discovery time period. (CMO 6 Parts III.B.-III.C.). Plaintiffs were to serve responses to each type of request within 45 days of service of them. Upon remand, the parties may obtain updated medical records.

c. <u>Depositions</u>. Defendants were entitled to conduct ten (10) depositions of fact witnesses ("fact witnesses" include plaintiffs' treating physicians) as part of their case-specific discovery. (CMO 6 Part III.D.). Defendants were allowed to take additional depositions upon a showing of good cause. Upon remand, the parties may move the transferor court to take additional depositions including newly identified fact witnesses regarding plaintiff's current medical condition for good cause and necessity. In the event good cause and necessity is shown to update the plaintiff's deposition, shortened time limits may be imposed, depending on the circumstances.

2. <u>Case-Specific Fact Discovery of Defendants</u>. Plaintiffs were allowed to propound on defendants no more than ten (10) case-specific interrogatories and ten (10) case-specific document requests. (CMO 6 Part IV.A.-IV.B.). Plaintiffs were also allowed to

conduct case-specific depositions of witnesses affiliated with defendants. (CMO 6 Part IV.C.).

B. Expert Discovery.

1. Generally. Expert discovery was divided into two main categories: generic experts (testifying regarding issues of general applicability, including general causation) and case-specific experts (testifying on behalf of a specific plaintiff). The Court ordered that only generic expert discovery would be conducted in the MDL, leaving case-specific expert discovery for completion upon remand. Under the process established by the MDL Court, experts were disclosed by certain members of the PSC and by defendants. Individual plaintiffs could then adopt those expert disclosures or disclose their own experts. If a plaintiff adopted the experts disclosed by certain members of the PSC with respect to any issues of widespread applicability, that plaintiff may nevertheless later designate different experts to testify at trial on the same issues provided: (1) the later-designated experts rely upon the same or substantially the same evidence, opinions and/or theories relied upon by the PSC expert(s) adopted by that plaintiff; and (2) such opinions, evidence and/or theories have not been previously determined by the MDL to be scientifically unreliable or otherwise inadmissible. Similarly, a defendant may later may later designate expert(s) different from the generic expert(s) disclosed by defendants to testify at trial on the same issues provided that the later-designated expert(s) rely upon the same or substantially the same evidence, opinions and/or theories relied upon by defendants' previously disclosed generic expert(s). Expert-specific challenges, such as to the qualifications or specific causation opinions to the later-designated experts, are preserved. These issues are addressed more specifically in prior MDL Orders, including without limit MDL Order entered September 9, 2002.

Numerous general causation experts on behalf of both plaintiffs and defendants testified at their depositions. Discovery as to these experts was to be completed by March 10, 2003,

with subsequently transferred cases subject to the provisions of CMO 9 which provides for the adoption of, or designation of experts on issues of general applicability. (Order re: Expert Discovery Schedule (Mar. 22, 2002) and CMO 9). Several general causation experts also testified at the *Daubert* hearing. A copy is attached hereto.

2. ***Daubert***. On April 28 – May 1, 2003, the Court conducted hearings regarding the admissibility of plaintiffs' expert opinions as to general causation pursuant to Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. 579 (1993). The Court entered its findings in its Order Granting in Part and Denying in Part MDL Defendants' Motion to Preclude Plaintiffs' Expert Opinions as to General Causation Pursuant to Fed. R. Evid. 702 and 703 and *Daubert*, on June 18, 2003.

3. **Case-Specific Expert Discovery**. Upon remand of the cases back to the transferor courts, case-specific expert discovery must be conducted. This will include scheduling of plaintiffs' and defendants' designations of case-specific experts, service of reports by the case-specific experts, depositions of case-specific experts and motion practice relating to those experts. Case-specific experts consist of experts rendering opinions about the medical condition of specific plaintiffs, life-care planners, economists and other case-specific experts rendering non-medical opinions. This discovery may include independent medical examinations of plaintiffs. In contrast to the expert discovery in the MDL relating solely to general causation, case-specific experts will opine among other things on specific causation with regard to individual plaintiffs as well as damages.

## IV. PRODUCT IDENTIFICATION ORDERS

### A. Identification of Defendants and Products Ingested (CMO 13).

There were numerous cases pending in MDL 1407 that assert claims of individuals who allege to have ingested one or more PPA-containing products. Certain cases and/or plaintiffs listed numerous manufacturing defendants but failed to state with specificity which products they allegedly ingested and failed to identify the manufacturers of the products that allegedly caused their injuries. On May 2, 2003, the Court entered CMO 13 which required each plaintiff in a multi-defendant case to file and serve (within 30 days of entry of the order) an affirmation setting forth the PPA product he/she allegedly ingested and the manufacturer of that product. Defendants could then seek dismissals under CMO 13 for the claims of any plaintiffs who failed to identify them in the PFS, if any, and in their affirmations. (CMO 13).

Because of the potentially burdensome and unnecessary filings of numerous pages and documents, the parties submitted a proposed CMO 13A to the Court to streamline the dismissal process and minimize the amount of filings to obtain dismissals. CMO 13A provided the defendants whose products are not identified in a plaintiff's affirmation a mechanism for getting dismissed from the claims made by that plaintiff. (CMO 13A).

B. <u>Severance of Multiple-Plaintiff Cases (CMO 15)</u>.

There were numerous cases pending in MDL 1407 that joined the unrelated claims of numerous plaintiffs who allege to have taken a PPA-containing product. The plaintiffs in these multi-plaintiff cases failed to specify which products they allegedly ingested and failed to identify the manufacturers of the products that allegedly caused their injuries. On May 29, 2003, the Court entered CMO 15, which required each plaintiff in a multi-plaintiff[1] case to file and serve an individual new complaint within 30 days of entry of the order. Under CMO 15, plaintiffs' individual complaints were to provide specific allegations regarding: (1) the

[1] "Multi-plaintiff cases" refer to cases that involve more than one plaintiff who alleges that they ingested a product containing PPA. This term does not refer to plaintiffs with derivative claims.

products allegedly ingested; (2) the dates on which the products were ingested; (3) the injury alleged; and (4) the dates of injury. (CMO 15).

CMO 15A served as an adjunct to CMO 15 to give the parties a mechanism to resolve "non-compliant" served complaints and dismissal of original multi-plaintiff complaints. CMO 15A allowed defendants to move to dismiss with prejudice the original case as to those plaintiffs who failed to properly file an individual new complaint and as to those plaintiffs who filed an individual new complaint which did not identify a product manufactured by the moving defendant. (CMO 15A).

## V. PROCEDURES FOR REMAND

### A. Discovery to be Conducted Prior to Remand.

The Court entered CMO 17C which details the procedures and conditions before a case will be considered "ripe for remand." (CMO 17C). The Court only considers a case ripe for remand if the discovery permitted by CMOs Nos. 1, 6, 6A, 10, 13, 13A, and 15 ("and any additional orders" entered by the Court) has been completed. All other generic fact and expert discovery permitted by the Court is considered time barred. The remand process is initiated by defendants, on a monthly basis, filing a list of cases they believe have become ripe for remand during the preceding month. A plaintiff may also submit cases believed to be ripe. The Court then issues an Order to Show Cause why the cases listed on the Order should not be suggested for remand, setting dates for responses and replies. Once the Magistrate Judge has ruled on the objections to remand, the Court issues a Suggestion of Remand Order which is forwarded to the Judicial Panel On Multi-District Litigation. The Suggestion of Remand Order triggers the mediation requirements set forth in CMO 18C. The Court will subsequently designate this Final MDL Pretrial Order, along with any supplements and/or amendments thereto, as the Final Pretrial Order in all cases for which the Panel issues an Order for Remand. (CMO 17C).

**B. <u>Remaining Discovery After Remand.</u>**

Case-specific expert discovery has been deferred pending remand. The transferor court has jurisdiction over setting the case-specific expert discovery schedule, any other case-specific discovery and any other pre-trial matters not addressed by this Court. (*See supra* Part III.C.3.).

**C. <u>MDL Mediation Requirement.</u>**

Within seven (7) days of a case being named on the Court's Suggestion of Remand Order (*See supra* Part V.A.), the parties are to notify the Court whether they intend to mediate the case per CMO 18C in a submission entitled "Election Regarding Alternative Dispute Resolution." If the parties elect to mediate, the mediation is to be scheduled within 30 days and completed within 90 days of the date of the Suggestion of Remand Order. If the parties choose not to mediate, they are required to conduct a meet and confer conference with Special Master Professor Francis McGovern within 21 days of the Court's Preliminary Order. (CMO 18C). This Court appointed Professor McGovern as a Special Master to assist the Court in coordinating case management matters between the MDL litigation and the matters pending in state courts. (Order Jan. 17, 2002). Nothing in CMO 18C prevents the parties from agreeing to mediate these, or any additional cases or groups of cases before or after remand.

The parties have agreed upon a number of mediators from the following areas: California, Texas, Louisiana, Alabama, Mississippi, North Carolina, South Carolina, Tennessee, Northeast, Midwest and Northwest. Nothing in CMO 18C prevents the parties from agreeing to a mediator not on that list or agreeing to mediate any additional cases or groups of cases. (CMO 18C).

## VI. <u>SUMMARY OF ACTIVITIES UPON REMAND</u>

The following activities remain to be completed upon remand of the cases listed on Attachment A and include but are not limited to:

- Case-specific expert designation and discovery;
- Independent medical examinations;
- Obtain updated medical records and, upon a showing of good cause and necessity, updating the plaintiff's deposition, and/or deposing additional or newly identified fact witnesses. In the event good cause and necessity is shown to update the plaintiff's deposition, shortened time limits may be imposed, depending on the circumstances;
- Any pending motions that the parties bring to the attention of the transferor court;
- Pretrial motion practice, including specific causation motions; and
- Final disposition.

## VII. DOCUMENTS TO BE SENT TO TRANSFEROR COURT

The clerk of the transferee court will forward to the transferor court (electronically where feasible) a copy of: (1) this Pretrial Order and attachments; (2) the docket sheet for the particular case being remanded and all documents identified on that docket sheet; and (3) the docket sheet for MDL 1407. The docket sheet for each particular case being remanded will be deemed to include and incorporate all matters on the MDL 1407 docket sheet that refer or pertain to "all cases" or that otherwise refer or pertain to the particular case being remanded.

In the event a party believes that the docket sheet for a particular case being remanded is not correct or complete for any reason, a party to that case may, with notice to all other parties to the action, file with the transferor court a Designation Amending the Record. Upon receiving that Designation, the transferor court will make any needed changes to the docket. If the docket is revised to include additional documents, the parties should provide those documents to the transferor court.

## VIII. CONCLUSION

This MDL Pretrial Order does not expand or modify any prior order of the Court. The Plaintiffs' Steering Committee and defendants have agreed that, upon receipt from the Judicial Panel of a final remand order for a particular case, this Pretrial Order is to be provided to the appropriate transferor court without the necessity of a motion by any party to that case.

DATED at Seattle, Washington this 15th day of October, 2004.

s/ Barbara Jacobs Rothstein
HON. BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

# EXHIBIT C

**O'NEILL & MURPHY, LLP**
ATTORNEYS AT LAW

Timothy R. Murphy+•▲
Patrick H. O'Neill, Jr.•
Stephen M. Warner•
Cara C. Passaro
Michelle M. Mullenbach≠

1050 Degree of Honor Building
325 Cedar Street
Saint Paul, MN 55101-1015
Tel: (651) 292-8100
Fax: (651) 292-8111

5482 County Road 18
Post Office Box 880
Nisswa, MN 56468
Tel: (218) 963-8100
Fax: (651) 292-8111

Legal Assistants

Kimberly A. Lewis
Shannon M. Bettis
Rosemary Bohn

+ Certified Trial Specialist, MSBA, NBTA
• Also admitted in Wisconsin
▲ Qualified ADR Neutral
≠ Also admitted in Iowa

Reply To: St. Paul Office

September 23, 2004

**Via Facsimile & U.S. Mail**
Jane E. Joseph, Esq.
Lopez, Hodes, Restaino,
Milman & Skikos
13938A Cedar Road, #373
Cleveland, OH 44118

RE: **Alicia Quezada v. McKesson Corporation**

Dear Ms. Joseph:

I am in receipt of the Rule 30 (b)(6) Notice of Taking Deposition Duces Tecum of McKesson, dated September 15, 2004. I am writing in an effort to "meet and confer" regarding this ongoing discovery dispute. McKesson takes the position that this Notice is inappropriate, and asks that you voluntarily withdraw it. Our position remains that Plaintiff is not entitled to discovery from McKesson. This stance has been communicated to you in letters dating back to November 2003, when this Firm was first retained to defend McKesson, reiterated in McKesson's Objections to Plaintiff's written discovery, and further developed in McKesson's Response to the Court's Remand Order to Show Cause. Given McKesson's status as a non-manufacturing defendant, and where the Fact Discovery Deadline ("FDD") expired on January 22, 2004, we deem fact discovery to be complete.

A 30(b)(6) Notice is a discovery device that has been available to the Plaintiff since this case was filed in 2001. The issuance of this Notice is particularly questionable, when one considers that it calls for corporate representative depositions **10 months** after the expiration of the FDD, and where Plaintiff refused McKesson's request on January 6, 2004 to stipulate to an extension of the FDD for 90 days.

Furthermore, CMO 1(a) dictates that no depositions of corporate defendants may be taken outside the time allotted by the MDL court, absent agreement of the parties. Corporate representative depositions of an MDL defendant may only be taken after the expiration of

the FDD upon motion and a showing of good cause. Clearly, good cause has not been shown. Until or unless Judge Rothstein rules to the contrary, McKesson will not be tendering corporate representatives for depositions outside the FDD.

Please respond to this request in writing by October 4, 2004, or McKesson will file a Motion to Quash.

Very truly yours,

O'NEILL & MURPHY, LLP

Patrick H. O'Neill, Jr.
poneill@o-mlaw.com

PHO:smb

cc: Carole Ungvarsky, Esq. *(Via E-Mail Only)*
Sotera Anderson, Esq. *(Via E-Mail Only)*
Emily Hicks, Esq. *(Via E-Mail Only)*

# EXHIBIT
# D

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| IN RE: PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION. | MDL Docket No. 1407 |
| This document relates to: Florene Law, Plaintiff, | MDL Case No. 02-CV-2615 |
| vs. | ND Okla Case No. 02-CV-503 |
| Zee Medical, Inc., J.B. Laboratories, Inc.; L.N.K. International, Inc.; and McKesson Corporation, Defendants. | |

DEPOSITION OF KEVIN LLOYD

VOLUME I
(Pages 1 through 271)

Taken on Wednesday, February 4, 2004, at 9:45 a.m.

(LLOYD)

Deposition of KEVIN LLOYD, taken before Lisa Moskowitz, a Certified Shorthand Reporter for the State

quality control department did. On occasion there might be issues that would arise where I would enter into meetings and discussions about different issues.

Q. What about with respect to labeling and warnings? Did your job have any involvement in labeling and warnings?

A. Yes.

Q. How so?

A. I had primary responsibility for the labeling, FDA requirements including directions, uses, and warnings.

Q. What did you do? What was your job? What were your duties in that respect?

A. To write label copy for the products.

Q. Was there anybody else that assisted you with that job?







A. Early on for approximately the first four or five years, as I mentioned, I did not have a lot of prior experience in labeling of OTC drug products. So I relied very heavily on both Steve Egelhoff's experience and the McKesson law department. McKesson is our parent company.

Q. Tell me how you would go about obtaining the information to include on labels and warnings?

A. Again, early on I primarily relied on the current label copy, and then I also relied on review by Steve Egelhoff and by McKesson law department.

Q. Let's talk about the -- you said at least on one occasion you can recall the task force took up the issue of PPA, and you believe it was in conjunction with the DEA; correct?

MR. DALLER: Objection to the form of the question.

THE WITNESS: I don't believe they took up the issue. I believe they were communications that were issued from the task force providing information concerning DEA regulations.

BY MR. SCHILLING:

Q. Do you recall what those communications were?





A. I do not specifically.

Q. Were they in the form of memos?

A. They would be in the form of an informational sheet that was prepared by, I believe, the National Druggists Wholesale Association in which they would update various issues having to do with prescription drugs, other issues, and at times DEA regulations concerning list 1 chemicals.

Q. Did at any time that task force, during any of the meetings you attended, ever discuss what FDA was doing with regards to phenylpropanolamine?

A. I have not attended a regulatory task force meeting.

Q. Ever?

A. I have not.

Q. Is the meeting just for -- I don't know what

word you use -- certain members of the task force like an executive committee?

A. It's open to all members. To my knowledge, there have only been two meetings scheduled, and I did not attend either of those.

Q. When were those meetings? Roughly the year.

A. I can't remember the dates.

Q. Okay. Were they in the early 1990s? Late 1990s? Early 2000s?







A. I'd say probably around the year 2000.

(Off-the-record discussion held.)

BY MR. SCHILLING:

Q. Do you know if the task force prepares minutes of those meetings?

A. They did in the past.

Q. Are you copied -- as a member of the task force, are you copied on those minutes?

A. I believe I am.

Q. If you were copied, where would you have maintained those?

A. In the file we talked about.

Q. Okay. Let's go back. Any other involvement you can think of between your position at Zee Medical and McKesson Corporation?

A. No.

Q. Does McKesson provide or share any information with Zee Medical or your position with regard to

regulatory affairs?
A. Would you say that question again.
Q. Yeah. Does McKesson or a division of McKesson share or provide any information to you or your position at Zee Medical regarding regulatory issues?
A. Only the ones that we have discussed.
Q. Is there anybody at McKesson that is a source







of information for you who you can call and say, "I need some more information on this," and they'll assist you?
MR. DALLER: Objection to the form of the question.
THE WITNESS: Would you repeat that, please.
BY MR. SCHILLING:
Q. Sure, if I can. Is there any division or person at McKesson that is available to you as a source of information on regulatory issues?
A. We have talked about the McKesson law department, yes. In addition to that, there is one individual that I have had correspondence with concerning DEA issues.
Q. Who is that person?
A. I can't remember his name right at the moment.
Q. Do you recall his position?
A. No.
Q. I guess what would be a more direct question is is there a division of McKesson similar to yours that would be like a counterpart that you share information with?